### S. M. SHAW V. THE STATE.

*No. 604.   Decided May 8.*

1. **Murder—Means Used—Intent, Presumption of.**—On a trial for murder, where the important question, in consideration of the weapon used, is the intent of the accused, the statute prescribes certain rules by which the intention is to be ascertained. 1. The intention is presumed whenever the means used is such as would ordinarily result in the commission of the forbidden act. Penal Code, art. 50. 2. If the instrument be one not likely to produce death, it is not to be presumed that death was designed, unless, from the manner in which it was used, such intention evidently appears. Penal Code, art. 612. It follows from these statutes, (1) that the weapon or means used must possess the quality of "a deadly weapon," without regard to the manner in which it is used; or, (2) though not deadly, the manner of its use must show an evident intention to kill. In other words, the character of the weapon can not be fixed or determined by the manner of its use—it must ordinarily be a deadly weapon per se to warrant any presumption arising from its use; or if not such a weapon, the intent to kill must evidently appear from the manner of its use.

2. **Same—Charge of Court.**—On a trial for murder, where the court instructed the jury as follows: "Every person is presumed by law to intend whatever would be the reasonable and probable result of his own acts and the means used by him; and, when a homicide is committed, and the instrument used in committing the homicide, or the manner in which it was used, was reasonably calculated to produce death, then

the law presumes that such was the intent and design of the party committing the homicide." *Held*, that the portion with reference to the manner in which the instrument is used erroneously omits the important part of the rule, which requires, that when the intent to kill is inferred from the manner in which the weapon is used, that the intention to kill shall evidently appear; and instead of the expression, "or the manner in which it was used was reasonably calculated to produce death," it should have been, "or by the manner in which it was used the intention to kill evidently appeared."

3. Same.—Presumptions of law which are against the defendant should not ordinarily be given in charge to the jury; and when they are, great care should be observed to properly guard the rights of the defendant.

APPEAL from the District Court of Cooke. Tried below before Hon. D. E. BARRETT.

This appeal is from a conviction for murder of the second degree, the punishment being assessed at twenty years in the penitentiary.

The opinion gives a full statement of the case.

*Potter, Potter & Cofer*, for appellant.—The court erred in paragraph 18 of its charge in instructing the jury as follows: "Every person is presumed by law to intend whatever would be the reasonable and probable results of his own acts and means used by him; and when a homicide is committed, and the instrument used in committing the homicide, or the manner in which it was used, was reasonably calculated to produce death, then the law presumes that such was the design and intent of the party committing the homicide."

It would have taken a scientific man to have been able to do more damage in the same number of words than was done the defendant by the court in this charge. The defendant, when confronted with danger, had hastily picked up a stick and struck the deceased with it. The wound did not fracture the skull, did not break the skin on the head, but only created a small bruise. It was evident that the defendant did not desire to kill, or he would have followed up his advantage, and would not have expressed himself as afraid he had hit the deceased too hard; and ordinarily there could have been no serious danger from such a blow, but it so happened that it struck the deceased at a vital point, and doubtless caused his death. The result was, it killed the deceased, and when the jury are told that the law presumes that a man intends the natural consequences of his acts, and the act has been followed by death, of course an ordinary juror would at once say that death was the natural result of the act. Hence the charge was equivalent to saying, that if death resulted from the blow, then the defendant intended death when he struck the blow.

This wound, like the one in the case of Bell v. The State, 17 Texas Criminal Appeals, 552, was fatal because of its locality, and not because of the character of the instrument with which it was inflicted. Almost any instrument, under certain circumstances and used in a certain way, inflicting a wound at a certain point, might be a deadly

weapon, and cause death, and the law would not presume that a man intended death because he happened to hit the deceased at a vital place.

There was no evidence in this case indicating that the instrument used was a deadly weapon, save and except that it produced death, and this, as held by this court in the case before cited, would not authorize the charge given.

One of the grounds of defense in this case was, that the killing was unintentional, and from a view of the facts this court will doubtless say, that the jury would not only have been justified in finding it, but should have found the killing unintentional. This they would doubtless have done under correct instruction, but how could they so find when this abstract legal proposition, that had no sort of connection with this branch of the case, was injected into it by the court, who seems rather to have sought to educate the jury in abstract legal questions than to protect the rights of defendant?

*Mann Trice*, Assistant Attorney-General, for the State.

HURT, PRESIDING JUDGE.—This conviction is for murder in the second degree, the punishment being assessed at twenty years in the penitentiary. The uncontroverted facts in this case establish that the deceased was a young man, about grown, hired to work for the defendant about the 1st of February, 1893, on his farm in Cooke County, at $12.50 per month, with board and washing; that he continued in the employment of defendant until about the 16th or 17th of July of said year, when, not giving satisfaction to his employer, he was discharged. At the time he was discharged, the defendant was engaged in running a threshing machine, and deceased was one of the hands, and his business was to fire and run the engine. The discharge occurred on Friday or Saturday, and on the following Wednesday, Jones, the deceased, came to Cook's, where the defendant was then engaged in threshing wheat. An altercation occurred between defendant and deceased. The defendant struck the deceased a blow on the head, which knocked him down, and from the effects of which he died the next day. As to the details of the occurrence, there is some difference between the testimony of the witnesses for the State and defendant on the salient points. We will proceed to give the substance of the evidence.

It appears that the beginning of the trouble occurred with reference to the discharge of the deceased, Jones. The witness Crane testified, that he was present at the time the discharge occurred; that something occurred to stop the machine, and after they had fixed it, and started to begin running again, that the steam had gone down. Shaw said to Jones, "What in the world's the matter? You have got no steam, and you have done this way before. You get down from here and get away. I won't be bothered with you any longer." And then Jones

said, "Well, you will have to pay me, then." And Shaw said, "I will settle with you and pay you for every day's work that you have done." Shaw said to Jones that he had given him more trouble than any man he had ever had anything to do with in his life. Shaw says, that when he found that the steam had gone down, he asked Jones what was the matter; and he said, "I am getting tired of this damn outfit," and that he then told him (Jones) to get away and go off from there. Jones wanted his pay. Shaw remarked to him that he would settle with him, and Jones went off to the provision wagon, and came back by the separator, and demanded his year's wages, and said, "You have discharged me. I want you to pay me my year's wages, according to the contract." That he told him, that if he had complied with his contract he would have paid him his whole year's wages; that he would settle with him for every hour's work that he had done. Deceased said, "If you don't pay me, I will sue you before the sun goes down." Defendant then said, "Go on and sue, and don't come around me any more." It appears that deceased then left.

There is some evidence that, between that time and the killing, deceased went to Gainesville to consult a lawyer about collecting his wages from defendant, and he mentioned the matter to several persons, and, in that connection, made some threats against the defendant. To Will Solomon, a witness for defendant, he said he had come down to see if he could make anything out of Shaw by law; that if he found he could not get it out of him one way, he would another. To Ance Sullivan, another witness, he used about the same expression. D. H. Pettcord testified, that about ten days before the killing, but after the discharge of deceased, he had a conversation with deceased, in the course of which Jones said that he intended to kill Shaw if he did not pay him; that he had as good a pistol as was ever fired; that he had run away from Tennessee for killing a damn nigger; that he would kill Shaw or get his pay. Joe Dunlap testified, that deceased told him he was going to town to see if he could get his wages out of Shaw by law, and that if he could not get it that way, he would get it some other way; if he didn't pay him, he would shoot hell out of him, and leave the country; that he would give him three days to pay him. One of these witnesses, to wit, Ance Sullivan, communicated to defendant what Jones had told him, to wit, that he was going to make him pay his year's wages, and that, if he did not one way, he was going to get it some other way. There is testimony in the record that Jones owned a pistol a short time prior to the homicide. It was also in testimony, that he went to where the defendant was threshing wheat in the neighborhood, to one Trew's farm, on Monday succeeding the Saturday on which he was discharged, staid around the thresher awhile, and conversed with the hands. Shaw was then present, but no conversation took place between the parties. The evidence also established, that deceased weighed about 130 or 135 pounds, and defendant 150 or 160 pounds. The record also shows, that the defendant was indebted to

Jones at the time of the homicide for a part of his wages.   Defendant himself says that he owed him $36.50, which he had been ready to pay, but that Jones claimed the whole year's wages.

On Wednesday, 20th July, about 3 o'clock in the evening, it appears that Jones went to where defendant was threshing wheat at Cook's farm, which is the place where the homicide occurred.   As to what occurred here the witness Tom Rossen states, that "Jones came up, and leaned up against the hind end of the coal wagon.   He was standing looking at the engine when I first saw Shaw.   He was talking with Jones.   They were both at the coal wagon.   He was standing out west of the wagon, towards the north side of the engine.   Jones was talking to him about suing him for a year's work.   Shaw said, 'I understand you are going to sue me for a whole year's work.'   I don't recollect what Jones said.   Jones said afterwards, 'You haven't got anything but a damn little homestead, and you beat the people out of that.'   Shaw told him not to talk that way.   Shaw didn't do anything then, but pretty soon he told Jones to take his hands out of his pocket, and told him two or three times before he hit him with the stick.   He told him once or twice after he picked up the stick.   Shaw had hold of the stick with both hands when he hit him.   He hit him on the head.   He struck him twice, one glancing blow, and then struck back.   I never saw any effects of the first lick.   He struck the first lick at the right side of the head.   He was knocked down.   He fell with his head under the apron of the engine.   He was knocked down at the second lick. That lick hit him on the left side of the head, and knocked him down. He raised up a little on his elbows, remained in that position a little while, and then stood up.   When he raised up on his elbows, he said to Mr. Shaw, 'Don't hit me any more,' or 'Don't let him hit me any more,' or something like that."   That he carried him to one Brown's house, not far off, and laid him down, and sent for a doctor.   This witness testified, that at the time the killing occurred, deceased was leaning against the wagon with his left hand in his pocket.   That he could not see the other hand.   Shaw was standing in front of him, three or four feet off, when he told him to take his hands out of his pocket.   That he told him two or three times; the first time when he started to pick up the stick, and continued telling him until he hit him.   Jones did not take his hands out.   As to the stick, he testified he did not know how long it was.   It was a piece of wood which was used to burn in the engine.   That he never saw the stick any more after defendant hit Jones.   When the stick first came up and then came down, it seemed that he had brought the other hand to it in bringing it down.   This witness also testified, that during the conversation he heard Jones say to Shaw, "If I was to sue you I couldn't get anything out of you; you having nothing but that damn little homestead, and you beat the people out of that."   Shaw told Jones, "You have no business here.   You have been around here bothering me, and giving me a great deal of trouble, and I want you to go away from

this machine, and let me alone.'' Jones told Shaw that there were judgments hanging over him (Shaw). Shaw replied that he would give $500 for every one that he could find. Something was said about shooting a nigger in that conversation. Shaw said, that just when he needed Jones most, he had stated to him that he had killed a nigger in Tennessee, and that they had found out where he was, and that he had to skip out. Jones then said, "Damn you, I did kill a nigger."

James White testified for the State, that he was present at the killing. Saw Rossen and Jones go to the machine. That they went up to the engine, and Jones leaned up on the coal wagon. That he had his right hand in his pocket, and his left partly. That he saw Shaw walk around towards the front of the engine, and stoop down, and pick up a stick, and step forward, "or it looked like it to me," and then the boy got out of my sight. That he did not see the lick struck. He saw the boy raise himself, and sit up in front of the engine. That he saw the stick afterwards. That it was a straight piece of elm wood, brought there, and about three inches in circumference, and two and one-half to three feet long. That he thought the stick was the same size from one end to another.

Oakley Snipes testified, in substance, that the first time he saw Jones he was leaning against the coal wagon, two or three steps east of the engine. That the parties entered into a conversation. That he did not hear how it began. Heard Jones say something like "How did you get it?" "Then he said something I did not understand, and defendant said it was a lie, and Jones straightened up from the wagon, and told him not to call him a liar." That Shaw told him to take his hands out of his pocket, and Jones did not say anything, but straightened up from the wagon. That Shaw then picked up a stick, and told him again to take his hands out of his pockets. Jones did not take them out. That Shaw then struck at him. That this lick never struck him at all, as he dodged, and passed over his head. That he then brought it back, and hit Jones on the side of the head. That that lick knocked him down, but that he raised himself up on his knees, and said, "Boys, don't let him hit me any more." Tom Rossen went over to him, and took Jones to Mr. Brown's. That "the stick was burned in the engine by either Shaw or the engineer, but I believe it was Shaw." That it was burned the same evening.

C. P. Crane, a witness for the State, testified, that he was present at the difficulty, and witnessed it. That he saw Jones and Rossen when they came to the thresher. That Jones came down to the engine where he was, and commenced talking to him. That he was standing at the fuel wagon. "That was five or ten minutes before I saw the defendant, Shaw. Shaw came from the separator. He didn't say anything until he saw Jones, and then he commenced talking, and told him to leave there, and said something about Jones suing him for a year's work. Jones was leaning against the back of the fuel wagon then, with his hands in his pockets. Jones said: 'I will have to sue

you if I get anything out of you. You turned me off.' Shaw said that he (Jones) had acted so badly that he had just let him go; and he said· 'You might have been here, doing me good, and making yourself something, instead of going around and doing nothing.' He also said: 'You have been trying to get off. You came and told me that you had killed a nigger, and that you had been found out, and wanted to get away on that account.' Jones said: 'How do you know but what I did?'" That it seemed to him that Shaw said it as if he thought it was only a pretext to get away. When they warmed up in their conversation, Jones said in regard to suing him: "If I sue you, I can not get anything out of you. You have got judgments hanging over you now, and you have got nothing but your little old homestead, and how did you get that?" Shaw then said that any man that said he had judgments hanging over him told a lie, or a damn lie. Shaw had nothing in his hands then—when Shaw called him a damn liar. He still kept his hands in his pockets. Shaw then ordered him to take his hands out of his pockets; took up a stick, and hit him. He ordered Jones to take his hands out of his pockets before and after he picked up the stick. Jones did not take his hands out of his pockets. Shaw struck twice. The last lick knocked Jones down. He fell under the apron of the engine. He did not get up right at once. He said he did not know whether he could get up from there or not. This witness testified, that the stick Shaw struck with was about two and one-half inches in circumference at the big end, and about one inch at the other end; that he supposed the stick was burnt in the furnace, as he never thought about keeping the stick, as he did not think it would be anything serious; that about the time deceased left with Rossen defendant said, "I expect I hit that boy harder than I intended, or rather than I should have done," or something like that.

The defendant himself testified, that Jones came where he was threshing on Wednesday evening. "While I was standing at the engine, putting some rosin on the belt, I stepped around to get some old rosin. I said to him, 'Now Jones, get away from here.' I said, 'You are telling it through the neighborhood that you are going to sue me for a year's wages; and I want you to go away from here and leave me alone. When I hired you, your work was not worth anything to me; and when your work became of some worth to me, you came to me and said that you had killed a nigger in Tennessee, and that you had to go away.' And he said, 'Yes, damn you, I did kill a nigger in Tennessee. You talk about suing, but you have got nothing but your damned little homestead, and you cheated your neighbors out of that. There are judgments standing against you in town, and not a cent can be made out of them.' I said it was a lie. He had his hands in his pockets, but I told him to take them out. He took his left hand out, and put it on his pants, near the right pocket. I was standing by the box near the engine, and when I told Jones it was a lie, he fixed his eyes on me, and said, 'Don't call me a liar. Don't call me a liar.' He raised up, and

moved towards me. I stooped down. There was an iron poker lying there, but I did not want to use that; so I picked up a stick, and told him to take his hands out of his pockets again. I caught the stick up with both hands, and as I lifted it, he dodged, and when his head came up again, I struck him. He staggered forward, and fell with his head towards the engine. These were the only licks ever struck. I know I never hit him the first lick; just tipped the back of his head. When the stick struck him, it flew out of my hand and fell to the ground. I did not pick it up, and paid no more attention to it. When he fell on the ground, I said to him, 'Jones, I want you to keep away from this engine, and not come around here bothering me any more.'" Defendant testified, that afterwards he inquired about how Jones was, and was informed that he was hurt pretty bad, but that it was thought he would get over it, and that he said, "If that is the case, I had better pay a fine for fighting, and by that means it will not cost me a great deal." This witness said, when Jones told him not to call him a liar, he stepped towards him with his hand in his pocket. "I thought he was cocking a pistol in his pocket, and was going to shoot me. He had his left hand down on his waistband near the right pocket. I had no intention of killing him."

D. C. Cunningham, witness for the State, testified, that he was at the thresher or near there when the difficulty occurred; that he did not see the licks that were struck; that after Jones had been knocked down he walked up close to the fire box, and saw him sitting there, and walked to the barrel, and made some remark. I said, 'He had a damn sight better have paid that boy off. It will cause him more trouble than he imagines.' Shaw said, 'I will knock any God damn man in the head who will talk to me as he did.'"

In addition, it was proven that a physician made a superficial examination of the wound inflicted on the head of the deceased with his fingers, and gave it as his opinion that the skull was not fractured. The deceased died the day after the wound was inflicted. This was all the testimony introduced that is material to be considered in the case.

The court charged murder of the first and second degree, and manslaughter and aggravated assault and self-defense. After a careful examination, we discover no error in any portion of the charge of the court, except that portion relating to the intent to kill. If the appellant intended to kill the deceased (the charge being correct), then the jury would have been justified in finding him guilty of murder in the second degree. This intention is presumed (article 50, Penal Code) whenever the means used is such as would ordinarily result in the commission of the forbidden act; that is, in this case, the death of the deceased. The means used in this case was a stick about one inch in diameter, and two and a half feet in length. Was such an instrument ordinarily calculated to produce death when used as a bludgeon? What is the meaning of "ordinarily" as used in this article? Ac-

cording to established order; methodical; regular; customary, as the ordinary forms of law or justice; common, usual. Webst. Dict. Now, then, would a blow with such a weapon, such means, usually or commonly result in death? We think not. But concede that the weapon used in this case was not ordinarily, commonly, usually calculated to produce death; still the intent to kill may appear from the manner of its use. Article 612, Penal Code. But, if the weapon or means used is not ordinarily calculated to produce death, it must evidently appear from the manner of its use that such was the intention; namely, to kill. The weapon or means used must possess the quality of what is known as a "deadly weapon," without regard to the manner in which it is used, or, though not deadly, the manner of its use must show an evident intention to kill. If the weapon be not such a one as is described above, then the law (article 50) makes no presumption to the effect that the offense was intended. But, to the contrary, article 612 forbids such presumption, unless from the manner of its use the intention to kill evidently appears. The character of the weapon can not be fixed or determined by the manner of its use. It must be, ordinarily, a deadly weapon, in order to warrant the presumption in article 50. If the weapon be not such, and the intent to kill does not evidently appear from the manner of its use, then the intent to kill is wanting. But the party may be guilty of murder, though the weapon was not ordinarily deadly, nor from the manner of use the intention to kill is evident, if the injury resulting in death was inflicted in a cruel manner, or when the circumstances attending the homicide show an evil or cruel disposition. It is not contended by the State that this homicide was attended by any such circumstances, and we need not further notice these. Articles 613–615.

Now, when the homicide occurs under the influence of sudden passion, but by the use of means not in their nature calculated to produce death, the person killing is not deemed guilty of the homicide, unless it appears that there was an intention to kill; but the party from whose act the death resulted may be prosecuted for and convicted of any grade of assault and battery. Article 614. The court instructed the jury upon this subject as follows: "The instrument or means by which a homicide is committed are to be taken into consideration in judging of the intent of the party offending. If the instrument be one not likely to produce death, it is not to be presumed that death was designed, unless, from the manner in which it was used, such intention evidently appears." "(17) Where homicide occurs under the influence of sudden passion, but by the use of means not in their nature calculated to produce death, the person killing is not deemed guilty of the homicide, unless it appears that there was an intent to kill. (18) Every person is presumed by the law to intend whatever would be the reasonable or probable result of his own acts and the means used by him. And when a homicide is committed, and the instrument used in committing the homicide, or the manner in which it was used, was

reasonably calculated to produce death, then the law presumes that such was the design and intent of the party committing the homicide. (19) The use of any unlawful violence upon the person of another with intent to injure him, whatever be the means or degree of violence used, is an assault and battery. An assault and battery becomes aggravated when a serious bodily injury is inflicted upon the person assaulted. If you believe from the evidence that defendant struck said Jones with a stick, and inflicted upon him a serious bodily injury, and that said Jones died from the effect of such injury, and that defendant was not acting in self-defense; and if you further find that defendant was under the influence of sudden passion, and that the stick used by him in the manner used was not calculated to produce death; and if the evidence fails to show that it was the intention of defendant to kill said Jones, then you will acquit defendant of homicide, but will convict him of aggravated assault and battery, and assess his punishment at a fine of not less than $25 nor more than $1000, or imprisonment in the county jail not less than one month nor more than two years, or by both such fine and imprisonment."

Appellant reserved an exception to the eighteenth paragraph, because it was not law. It reads: "Every person is presumed by law to intend whatever would be the reasonable and probable result of his own acts and the means used by him. And when a homicide is committed, and the instrument used in committing the homicide or the means in which it was used was reasonably calculated to produce death, then the law presumes that such was the design and intent of the party committing the homicide." The charge is a material alteration of the rules expressly provided as applicable to the facts of this case by article 612. Cruel or evil disposition on part of the slayer and the cruel manner of inflicting the injury apart, the only question raised is the intent of the accused. Did he intend to kill deceased? Article 612 provides the test by which this question must be answered: (1) Was the stick likely to produce death? Was it ordinarily a deadly weapon, without regard to the manner in which it was used? If not, the intent to kill must not be presumed. Or did the manner of its use show evidently an intention to kill? If so, appellant was guilty of the homicide. Now, it will be seen that the intent of the party killing is the issue. Did he intend to kill deceased when he struck him, if he is guilty of the homicide? How must this intention be shown? By the character of the weapon. If it be a deadly weapon —one likely to produce death—the presumption is that he intended to kill, because he used such a weapon. The weapon not being likely to produce death, the intent to kill can be shown in another way—that the appellant used the weapon in such a manner as to evince evidently an intention to kill. By either method the intention to kill is established. The charge charges these methods of establishing the intent to kill. "If the instrument used or the manner of its use was reasonably calculated to produce death, then the law presumes the inten-

tion to kill." That part of the charge with reference to the instrument may not be objectionable, though the word "reasonably" is added, but that part with reference to the manner in which the instrument is used is evidently wrong. The charge omits an important part of the rule, which requires, when the intent to kill is inferred from the manner in which the weapon is used, that the intention to kill shall evidently appear. The charge given and objected to substitutes this for the rule, to wit: "Or the manner in which it was used was reasonably calculated to produce death." The charge should have been, instead thereof, as follows: "Or by the manner in which it was used the intention to kill evidently appeared." This is the law which the statutes prescribe shall be given in just such a case as this. Let us suppose that the weapon was not ordinarily calculated to produce death, but that the blow was reasonably calculated to have that effect. Would it follow as a matter of fact—would the law presume—that the party giving the blow intended to kill? The weapon not being calculated to produce death, but death resulting from the blow, the intent to kill is evidently established. A, in a heat of passion, with a stick strikes B. B dies from the effects of the blow. Therefore A intended to kill B. Why? Not because he intended to do so, but because he is responsible for the consequences of his act. Now, the mode in which he used the stick may not show this intent, but, as B died, A intended his death. In what light would the jury view this charge? To what fact would they be likely to look? To the fact that the blow killed the deceased. They would be likely to reason but from one point, namely, that appellant killed deceased with a stick. The character of the stick and the manner of its use would be determined from the fact, "the boy is dead." The error of the court was upon a crucial point in the case, and was calculated to mislead the jury. Presumptions of law which are against the defendant should not ordinarily be given in charge to the jury; and when they are, great care should be observed to properly guard the rights of the defendant. The intent with which the wound was inflicted in this case was a most vital issue to the defendant. Upon this pivot hung his fate, and when the court told the jury, that if they believed the manner in which the stick was used "was reasonably calculated to produce death, then the law presumes that such was the design and intent of the party committing the homicide," it committed an error which must cause the reversal of this judgment. The charge in other respects is an admirable presentation of the law.

The judgment is reversed, and the cause remanded.

*Reversed and remanded.*

Judges all present and concurring.