## WILL DANFORTH v. THE STATE.

### No. 2396. Decided June 11, 1902.

**1.—Murder—Intent to Kill—Weapon Used.**

On a trial for murder, where the indictment alleged that it was committed with a piece of iron piping, and it appeared that defendant struck deceased with said piece of iron piping, the same not necessarily likely to produce death, it was a question for the jury as to whether there was an intent to kill on the part of defendant; and it was essential, to warrant a conviction of murder, that the evidence should show that defendant intended to kill.

**2.—Same—Charge of Court.**

Where the weapon used, which occasioned the death of deceased, was not necessarily a deadly weapon, or one likely to produce death, it was error for the court to fail and refuse to charge the jury, as requested by defendant, that "in all cases of homicide the law requires, as an element of guilt, an intent to kill; and if in this case you find that defendant did not, when he struck deceased, * * * intend to kill him, you should acquit of all grades of homicide and inquire only as to whether he is guilty of an aggravated assault."

**3.—Same.**

Where the instrument used was one not likely to produce death, it then becomes a controverted question of criminal intent that should be submitted, by a proper charge, to the jury; and if the evidence failed to show the specific intent to kill, defendant would not be guilty of homicide, but might be guilty of aggravated assault.

**4.—Same.**

When the evidence raises the issue of the intent with which an act is done, the question of intent must be left to the jury to decide under proper instructions.

**5.—Weapon Used.**

It is not every weapon used that might produce death that makes manifest the fact that the specific intent to kill existed; and it can not be said that an iron pipe half an inch in diameter and thirty inches long is, per se, calculated to produce death.

**6.—Manslaughter—Aggravated Assault—Simple Assault.**

On a trial for murder, where it appeared that defendant got whisky from deceased for which he refused to pay, and, having left, returned again, when he again refused to pay for the whisky; whereupon deceased struck him over the head with an iron pipe, inflicting a wound causing pain and bloodshed, and defendant seizing and taking the iron pipe from deceased, struck him with it, inflicting death,—defendant would not be guilty of any higher grade of homicide than manslaughter, although he may have intended to kill deceased. If he did not intend to kill him, he would only be guilty of aggravated assault, provided the weapon was a deadly one. And if the weapon was not a deadly one and defendant had no specific intent to kill, he was guilty of no higher offense than simple assault.

**7.—Murder—Indictment—Allegation and Proof.**

Where the indictment for murder charged that it was committed by striking with an iron pipe, this allegation was descriptive of the offense and was essential to be proved as alleged.

Appeal from the District Court of Hays.   Tried below before Hon. L. W. Moore.

Appeal from a conviction of murder in the second degree; penalty, six years imprisonment in the penitentiary.

Appellant was charged by the indictment with the murder of C. H. Haney, on the 10th day of December, 1901, by striking him with a piece of iron piping.

The opinion states the essential facts attendant upon the killing.

*Will G. Barber,* for appellant.—The court erred in refusing to give special charge number 1 asked by defendant.   The question as to whether defendant, if he was in fact the person who struck deceased, intended to kill him, was a prominent and vital point in the case; and the court having wholly failed to charge on the point in its general charge, should have given this special charge.   If for any reason this charge was an inaccurate statement of the law, it was clearly sufficient to call the attention of the court to the issue and the necessity of a charge thereon, and the court should have given this or some other correct charge thereon.

The charge of the court is deficient and fatally erroneous in this: The court nowhere informs the jury that defendant must have intended to kill deceased before they could convict defendant of either murder or manslaughter.   When a homicide is committed in the perpetration of a felony, no intent to kill is necessary; but this is not such a case.

Again, where the circumstances attending the homicide show an evil or cruel disposition, this will probably relieve the State of showing an actual intent to kill under provision of article 720, Penal Code; but this case is not made by the evidence; at least, certainly not so clearly as to justify the court in refusing to charge on the intent to kill.   Now, under all other conditions the intent to kill is an issue of fact to be found by the jury in all homicide cases, and the court must so charge.

The evidence in this case was such that the court should certainly have charged the jury, when specially requested by defendant, the effect of an absence of any intent to kill on the part of the defendant.

Restating, to some extent, our complaint against the charge of the court on the subject of failure to charge on the necessity of an intent to kill before the jury could convict of any grade of homicide, and again urging that the whole charge was eroneous, we insist:

1.   The court can not excuse the failure to charge as to this issue under article 51, Penal Code, because (1) the evidence did not even suggest that the piece of iron pipe was a deadly weapon, or one the use of which would ordinarily result in death as contemplated by said article 51, and as construed by the courts; (2) but if the evidence was sufficient to suggest such issue, then its sufficiency was for the jury, under proper instructions.

2.   The court can not excuse its failure to so charge under article 717, Penal Code, because (1) the evidence was not sufficient to show that the piece of iron pipe was a deadly weapon or one likely to pro-

duce death; nor that the manner of its use was such as to make an intent to produce death "evidently" appear.    (2) Under article 717 and article 51 the weapon to be a deadly weapon (so as to authorize from its character alone the presumption or finding of an intent to kill) must possess the character of a deadly weapon without the regard to the manner of its use, and the evidence in this case wholly fails to give to the weapon alleged to have been used such character.    (3) Before any presumption or finding of an intent to cause death is authorized from the maner of the use of the weapon, it must be such as to make evident or clear the existence of such intent.    In this case the evidence, instead of making such intent evident, tends to the contrary.    (4) But even if the evidence was sufficient to show a deadly weapon, or an evident intent to kill from the manner of its use, still these would be issues for the jury alone, and do not justify the court in refusing to submit the issue.

3.    The court can not excuse its failure to so charge under articles 718 and 720, Penal Code, because (1) the evidence does not show the presence of an evil or cruel disposition nor any injury inflicted in a cruel manner.    (2) But if the evidence suggested such issues, it was for the jury to decide the sufficiency thereof.

4.    No conditions existing which legally dispense with the necessity of an intent to kill to make the State's case, that fact remained one to be found by the jury; and the court should have submitted the issue directly and affirmatively.    This error is especially prejudicial because the evidence leaves it extremely doubtful as to whether such intent in fact ever existed.

The court should have submitted to the jury the law of aggravated assault.    While the court does, in its main charge in the printed portion thereof, give or set out article 717 of the Penal Code, yet it nowhere applies same directly to the facts of this case.    It is not enough simply to quote this article of the statute, but the court "should have instructed the jury in clear and explicit terms that they could only convict defendant of murder or of manslaughter in case that they believed that the instrument was one likely to produce death; or, if they did not so believe, that, from the manner in which it was used by appellant, such intention evidently appeared; and they should have been further instructed that, if they did not believe that the weapon used by appellant was of a deadly character, that is, likely to produce death, they would not presume against him that death was designed; and in such case, unless they found beyond a reasonable doubt that, from the manner in which said instrument was used, his intention to take life evidently appeared, that then they would acquit him of any grade of felonious homicide, and if they believed that the assault made by him was unlawful, they would find him guilty of an aggravated assault."

If the court considered the evidence strong enough to present the issue either of a deadly weapon, or an evident intent to kill from the manner of its use, then the law as to such issues should have been clearly

presented, as above set out. And in case the court thought the evidence insufficient to present either one or both of these issues, the court should have instructed an acquittal as to any grade of homicide.

Especially should the court have charged the law of aggravated assault when requested to do so by defendant.

The court should have directly submitted to the jury the law of aggravated assault under article 719, Penal Code, because the evidence raised such issue, and made the law of said article pertinently applicable.

Where the homicide is not shown to have been committed in the perpetration of a felony, nor in a cruel manner, nor with an evil or cruel disposition, then to constitute either murder or manslaughter, the party must intend to kill, and this is an issue for the jury. Penal Code, arts. 51, 717-720; Fitch v. State, 36 S. W. Rep., 584; Shaw v. State, 31 S. W. Rep., 381; Honeywell v. State, 49 S. W. Rep., 586; Griffin v. State, 50 S. W. Rep., 366; Johnson v. State, 60 S. W. Rep., 48; Bell v. State, 17 Texas Crim. App., 552; Dones v. State, 8 Texas Crim. App., 112; Nichols v. State, 24 Texas Crim. App., 137; Boyd v. State, 28 Texas Crim. App., 137; Martinez v. State, 33 S. W. Rep., 970.

If the weapon used by appellant was not of a deadly character, and if the manner of its use does not make evident an intent to kill, and if the circumstances of the case fall short of showing a design to kill or an evil or cruel disposition or manner of killing (all of which are issues for the jury), then the offense could not be more than aggravated assault.

By virtue of article 719, Penal Code, a homicide under sudden passion by means not in their nature calculated to produce death, is necessarily no more. than an aggravated assault, unless there is in fact an intent to kill and unless such intent is made to appear. Hill v. State, 11 Texas Crim. App., 456; Dones v. State, 8 Texas Crim. App., 112; Thompson v. State, 24 Texas Crim. App., 383; Honeywell v. State, supra; Johnson v. State, supra; Martinez v. State, supra.

Where the evidence is sufficient, when viewed most strongly in favor of defendant, to raise the issue of self-defense, the court must submit such issue to the jury. And where the State introduces a statement of defendant that reasonably embodies the issue of self-defense, the defendant is entitled to the benefit thereof, and the charge must be given. Jones v. State, 29 Texas Crim. App., 21; Pharr v. State, 7 Texas Crim. App., 472; Jackson v. State, 15 Texas Crim. App., 84; Robles v. State, 5 Texas Crim. App., 346-358; Pogue v. State, 12 Texas Crim. App., 283-296; Snell v. State, 29 Texas Crim. App., 236; Waldon v. State, 29 S. W. Rep., 273.

*Rob't A. John,* Assistant Attorney-General, for the State.

BROOKS, Judge.—Appellant was indicted for murder, convicted of murder in the second degree, and his punishment assessed at confinement in the penitentiary for a term of six years.

The following are substantially the facts proven upon the trial: Dr. Beall testified that about 8 o'clock on the morning after deceased received the injuries from which he died, he was called to see him, and found two wounds upon his head; one was a scalp wound on the left side of the head about one and one-half inches long, along or over the parietal bone. This wound ran from about the edge of the hair back about one and one-half inches. It was located about midway between the top of the ear and the top of the head on the left side. The other wound was on the left side of the head, extending from behind the left ear across the lower portion of the ear on to the jaw. This wound was probably three inches long, and was more of a bruise than a cut. Deceased was in an old house, where he lived. He died about 6 o'clock of the evening of the day witness was called to see him. The immediate cause of his death were the blows inflicted upon him. Deceased appeared to be a drinking man; "he looked like he drank all he could get hold of." He further testified, that neither of the wounds upon deceased broke any of the bones; that his experience as to the character of wounds on deceased is that they would not ordinarily prove fatal unless there were some injuries to the brain, which he did not have reason to believe in this particular case. The fact that no bones were broken, that the skull was not fractured, and that deceased was in a semi-comatose condition led witness to believe that the brain was not seriously injured. Witness has known several persons injured somewhat similar to deceased, and recovered. Witness was here shown the piece of iron pipe with which the injury is alleged to have been committed, and he testified, if a man of defendant's physical make up had struck deceased with this pipe as hard a lick as he could strike, witness would expect to find broken bones, especially if he struck a direct blow. Witness examined defendant the same evening he examined deceased and found a wound on his head over the edge of his hair, back and across the front portion of the top of his head. The wound was rather between a contused and incised wound, and appeared to be inflicted with some blunt instrument. It was from one and one-half to two inches long and cut not quite to the skull, but very near it. Witness found in defendant's hat an indentation that corresponded with the cut on his head. Witness treated the wound on defendant's head, washed it, took some stitches giving it regular treatment.

Albert Green testified that he knew deceased and defendant; was in San Marcos the day deceased died. Witness' house was about 200 yards from the house where deceased died. "I saw him about 7 o'clock that morning, lying at his door. My attention was called by hearing him groan. He was just inside of the door. The door was closed with the bottom panel broken out. I assisted deceased to his bed in the back part of the room; the room being very large, and in an old house that had practically been abandoned. There was another room on the east, where I think some Mexicans lived. In the room where deceased lived

there was a lot of scrap iron. Deceased's body was lying on the broken pieces or panel of the door."

John Mott testified that he was standing in front of his store, and hallooed to defendant in a joking way, "What made you beat old man Haynie up?" "Defendant raised his hat, showed me a cut on his head, and said, 'You don't blame me, do you? Would you not hit a man who hit you like that?' Defendant said he went up there; the old man stood in the door and he spoke to him, and the latter whaled away with something and knocked him silly. When defendant said this, he turned to Harrington, who was with him, and said, 'Didn't he, Kid?' Defendant then asked Harrington what Haynie had hit him (defendant) with, and Harrington said it was a bar of iron, and showed me how long it was. This was probably about 7:45 a. m. * * * The wound on defendant's head was bleeding. It was quite a wound, but I did not examine it. Defendant was then drunk. I noticed when he started away that he staggered. As far as I could tell, Harrington was sober."

Jackman, sheriff of Hays County, testified: "That he went to the room of deceased and found him lying just at the inside of the door. He did not seem to be conscious, and could not get him to speak. The door was closed, but most of the lower panel was out. Deceased was lying on his left side, with his back to the door, his head being to the north, and his feet close to where the door would open. I found there the iron piping which is produced in court, just in front of deceased, and a little to the right, four or five feet from him, sorter against an old pile of iron that was piled-up there. I found a little blood on the pipe, just at this place, close to the end where it is bent. There was a cot in the room, which I found saturated with blood. I also found a good deal of blood where the old man lay; also some on the window. We moved deceased to a cot. I saw defendant that morning ten or fifteen minutes after I went to deceased's room. He was there near where deceased died, and made a statement to me. Defendant said he knew who did the killing, and described two white men to me; told me which way they had gone; that they had gone towards the railroad; that it had not been very long that he saw them near there. He did not describe the young man Harrington who was afterwards arrested. I afterwards saw the wound upon defendant's head; but did not notice it at that time. He had some spots on his clothes and on his head. Defendant did not mention the young man Harrington to me. Later on I arrested or rather had Harrington arrested at San Antonio. He had no blood on his clothes that I saw. It was about 8 o'clock in the morning that I talked to defendant."

Lee Green testified that his attention was called to the condition of deceased by a Mexican on the morning of the day that he died. Thereupon he went over to the livery stable, near the home of deceased, and telephoned the sheriff. Witness saw defendant standing in the door of the office at the livery stable, and a young man was with him, afterwards arrested, and known as Harrington. Before witness notified the

sheriff, he had a conversation with defendant. Witness made the remark that some one had nearly killed old man Haynie. Defendant said, "God damn him, he ought to be killed."

Dr. Hons testified that the piece of pipe in question was about two and one-half feet to thirty inches long; it was a hollow piece of iron pipe, one-half inch in diameter; that it was not a new piece of iron pipe, but showed to have been used. It had flaked off some.

Charles Harrington, the main witness for the State, testified substantially that he went from San Antonio to San Marcos, reaching the latter place about 9 o'clock at night. Shortly after that time he met defendant, who was then in company with three negroes. Defendant said to witness: "Who are you? Where are you going? What are you doing at this time of night?" Witness replied he was looking for work and trying to get a bed. "We went to the livery barn in company with the negroes. From there we went to a place where defendant said we could get some whisky. The place defendant went to was the home of old man Haynie, deceased. The three negroes, myself, and defendant went there. Defendant and I went into the house and the three negroes stayed at the corner and played on some musical instruments. Defendant said to deceased, 'We want some whisky,' and defendant then picked up a bottle of whisky and gave it to me, and told me to go on outside. Deceased asked defendant for the money, and he said, 'I will pay you.' I went outside and defendant followed me. We came out and met the negroes and went down to a prostitute's house. Then we went to a Mexican's house. Two of the negroes started with us to the Mexican's house, and when we had gone about halfway, one of them asked defendant for money to buy pork chops. They then left us. Defendant rapped on the Mexican's door, and asked for some whisky. We went into the place they used for a kitchen, and got a bottle, but it was not full. Defendant took a drink and then threw up, while I held his head. From there we went back to the livery stable where defendant worked and he asked me if I was not going to stay with him. We had stayed at the Mexican's about ten minutes. Just before we got to the livery stable defendant said he was going to get some more whisky, and thereupon went and rapped upon deceased's door, and the old man hallooed, 'Ugh! ugh! ugh!' He then opened the door, and began to halloo. Deceased said, 'Get out of here; I want my money.' He kept asking for his money, and picked up an iron bar and hit defendant; and then defendant overpowered him and got the iron from him, and got him between his (defendant's) two feet, and while he had him in this position hit deceased. It was an iron pipe that he hit him with. I only saw defendant hit once. I went out of the house, and defendant followed. He slammed the door to, and kicked in the lower panel. We then went to the livery barn, and there I noticed a wound on the defendant's head. There was plenty of blood streaming from it. When defendant got to the barn, he asked me to wash the blood from his head; and he did not like the way I did it, so he swore at me, and said I was

no good. Defendant then said he was going over to black deceased's eye and get even with him. He went over to deceased's house. He asked me if I was not going to stay with him; that he would keep me as long as I was broke. I went as far as the corner of the pig-pen with him, and defendant went in. He rapped on the board window, and deceased said, 'Ugh! ugh! ugh!' and defendant crawled through the door. There was no light when we got there, but the old man made a light. The next thing I noticed, deceased was hallooing, and defendant's arm was lying out of the door, and I pulled him out with it; and when I got him out he said, 'Do you see what I have done to him?' After this we went back to the livery stable, and defendant got a quilt, put it on a summer bench in the yard, and I went to sleep; and defendant said he was going home. I suppose this was about 2 o'clock at night. I was aroused the next morning by a man who came into the stable. The man said, 'Somebody tried to kill old man Haynie and he was going to telephone.' This man, whose name I learned to be Mott, asked defendant the following question, 'Will, why did you try to kill old man Haynie?' and defendant said, 'Look at me; if the old prostitute hit you, would you not have done it?' Defendant said he hit the old man with an iron bar; and then asked me if he didn't, and I said yes. After that defendant insisted that I should walk out of town; and if I would not leave town, to keep away from him, and he called me a son of a bitch. I went to the depot, got on the blind baggage and made my way to San Antonio, where I was arrested."

These are in substance the main features of the evidence adduced upon the trial. We have copied it so much in detail in order to properly discuss the various questions raised in appellant's able brief.

By the various assignments of error appellant complains that the court erred in failing to charge the jury as to the necessity of specific intent to kill, as a condition precedent to conviction; and for failing to submit the law of aggravated assault. In this connection appellant asked the court to give the following charge: "In all cases of homicide the law requires, as an element of guilt, an intent to kill; and if in this case you find that defendant did not, when he struck Haynie (if you find that he did strike him), intend to kill him, then you should acquit him of all grades of homicide, and inquire only as to whether he is guilty of an aggravated assault." This was refused by the court. This was error. It should have been given. The question here presented was before us in Honeywell v. State, 40 Texas Crim. Rep., 199. We there held that, under article 717, Penal Code, which provides, "The instrument or means by which a homicide is committed are to be taken into consideration in judging of the intent of the party offending; if the instrument be one not likely to produce death it is not to be presumed that death was designed, unless from the manner in which it was used such intention evidently appears"—it becomes a question of fact for the jury to determine as to whether or not said intent exists. In other words, where the instrument is one not likely to produce death,

then it becomes a controverted question of criminal intent that should be submitted by a proper charge to the jury; and it must appear from the evidence that the manner in which it was used made it evident that defendant intended to kill, before the jury would be warranted in finding defendant guilty of homicide. In passing upon a similar question, Judge Hurt, in Fitch v. State, 37 Texas Crim. Rep., 540, said: "Where the homicide was not committed in the perpetration of a felony, and the circumstances do not show a cruel or evil disposition on the part of defendant, the intent to kill can not, as a matter of law, be inferred from a killing with a stick four feet long and two inches in diameter." And for other authorities on the same question, see Shaw v. State, 34 Texas Crim. Rep., 435; Griffin v. State, 50 S. W. Rep., 366; Johnson v. State, 60 S. W. Rep., 48; Martinez v. State, 33 S. W. Rep., 970; Bell v. State, 17 Texas Crim. App., 552; Dones v. State, 8 Texas Crim. App., 112; Nichols v. State, 24 Texas Crim. App., 137; Boyd v. State, 28 Texas Crim. App., 137. It follows, therefore, that if appellant did not have the specific intent to kill, he would not be guilty of any grade of homicide, but might be guilty of an aggravated assault; hence the court erred in not charging upon the issues above discussed. In other words, where the evidence raises the issue as to the intent with which the act is done, said intent must be left for the jury to decide under appropriate instructions, according to our Penal Code. If defendant assaulted deceased with the specific intent to kill, or if he did so in a cruel and wanton manner, thereby evidencing such specific intent, he might be guilty of a homicide; but if the jury do not believe from the evidence that at the time of this assault he had such specific intent, then he would not be guilty of any higher grade of offense than aggravated assault. The weapon does not per se evidence the fact that the same is a deadly weapon. It is not every weapon used that might produce death that makes manifest the fact that the specific intent to kill exists. As stated in the Fitch case, supra, there the party had a stick four feet long and two inches in diameter and struck deceased with it; yet this per se would not evidence the fact that he had the specific intent to kill, unless, from the manner of its use and the surrounding circumstances, such intent evidently appears. Article 719, Penal Code, provides: "Where a homicide occurs under the influence of sudden passion, but by the use of means not in their nature calculated to produce death, the person killing is not deemed guilty of the homicide unless it appears that there was an intention to kill; but the party from whose act the death resulted may be prosecuted for, and convicted of, any grade of assault and battery." Now, we can not say that a pipe half an inch in diameter, and thirty inches long is per se calculated to produce death; or, at any rate, it is an issue of fact as to whether or not it is, and such issue should be submitted to the jury. Reverting to the facts, we are of opinion that the same do not present the issues of murder in the first or second degree. It will be noted that appellant went into a place of business to buy whisky; that he failed to pay for the same. Subse-

quently he went away with the whisky, and refused at the time to pay for it. He returned, and deceased importuned him to pay for the whisky, and grabbed up the bar of iron, and struck him over the head with it. This was such a blow as the evidence indicates caused pain and bloodshed; and this fact is stated in the code as adequate cause, per se, to reduce the killing from murder to manslaughter. Now if defendant, while smarting under the blow inflicted upon him by deceased, jerked the weapon from the hands of deceased and struck deceased one or two blows over the head with it, and from these wounds so inflicted deceased died, then defendant could not be guilty, where the specific intent to kill is shown, of a higher grade of homicide than manslaughter. If defendant, smarting under the blow so inflicted, struck deceased, without such specific intent to kill, he would be guilty of an aggravated assault, if the jury believed from the evidence that the weapon used was a deadly one. Hill v. State, 11 Texas Crim. App., 456; Dones v. State, 8 Texas Crim. App., 112; Thompson v. State, 24 Texas Crim. App., 283, and other authorities cited above.

We note the earnest insistence of appellant that the evidence does not show that the piece of pipe was a deadly weapon. We have searched in vain in the record for any statement of this kind. If as a matter of fact the proof does not show this, then under the above contingency deceased could not be guilty of a higher grade of offense than simple assault; but if the weapon is shown to be one calculated to produce death, then, in law, it would become a deadly weapon, and the court would be authorized in submitting the issue of manslaughter and aggravated assault. Appellant insist that the evidence required a charge on the law of self-defense. We do not think this is presented by the evidence. Appellant insists that the court erred in failing to give special charge number 5, which is as follows: "If you find under the court's charge that the witness Harrington is an accomplice, as that term is defined, and that there is no evidence in this case tending to corroborate such witness' statement that defendant returned to the house of deceased a third time, then you will discard all testimony as to the third visit in determining the question of defendant's guilt or innocence." We do not think the court erred in failing to give this charge. The fact that appellant returned to the house after the beating given deceased in the first instance would not exclude the subsequent return as a circumstance going to show defendant's animus and criminal intent and to illustrate his feelings at the time of the previous difficulty. But appellant's requested charge suggests to us a more serious trouble. It appears from the indictment that defendant is charged with murder by striking deceased with a piece of iron pipe. Under a long line of authorities this becomes a description of the offense, and must be proved as alleged. It is the only count in the indictment. Reverting to the facts, it appears from the accomplice's testimony that defendant returned to the house, after giving deceased the first beating, and renewed the difficulty. On this last visit of defendant the evidence is clear that deceased was conscious, and that

defendant beat or engaged in an altercation again with him in the house—the character of which is not made known. If the jury believed from the evidence that defendant killed deceased during the progress of the second difficulty, and that the same was not done with the piece of iron piping, they could not convict him under this indictment. In this connection we note that the learned trial court, among the latter clauses of his charge, gives the following: "If you have any reasonable doubt of the corroboration of said witness, if you believe him an accomplice by other evidence tending to show that deceased was killed by a piece of iron piping, you will acquit." This evidently was intended to cover appellant's contention, and is sufficient.

For the errors discussed, the judgment is reversed and the cause remanded.

*Reversed and remanded.*