### Jim Jones v. State.

#### No. 2165. Decided January 22, 1913.

**1.—Murder—Charge of Court—Aggravated Assault—Deadly Weapon.**

Where, upon trial of murder and a conviction of manslaughter, the evidence showed that the knife which defendant used was a pocket-knife, carried in his watch pocket and could not have been very large, and there was no description of said knife, and the wound inflicted was in a dangerous locality of the body where it would probably strike an artery, and defendant testified that he did not intend to kill, but used said knife in self-defense, the court should have charged aggravated assault, and the provisions of Art. 1147, Revised Penal Code. Following Connelly v. State, 45 Texas Crim. Rep., 142 and other cases.

**2.—Same—Evidence—Threats—Character of Deceased.**

Where, upon trial of murder, the evidence showed deceased was of a dangerous and desperate character, and had told defendant that she had killed one negro and that she purposed killing him, the court should have permitted defendant to show that deceased did kill another negro who was her own husband, although defendant had not shown that he was aware of this fact at the time the threat was made. Following Childers v. State, 30 Texas Crim. App., 160.

**3.—Same—Charge of Court—Self-defense.**

Where, upon trial of murder, the evidence raised the issue of self-defense, the court should have given a clear and affirmative charge thereon.

Appeal from the District Court of Navarro. Tried below before the Hon. H. B. Daviss.

Appeal from a conviction of manslaughter; penalty, two years imprisonment in the penitentiary.

The opinion states the case.

*Gibson & Callaway,* for appellant.—On question of court's failure to charge on aggravated assault and deadly weapons: Honeywell v. State, 49 S. W. Rep., 586; Fitch v. State, 36 S. W. Rep., 584; Griffin v. State, 50 S. W. Rep., 366; Johnson v. State, 60 S. W. Rep., 48, and cases cited in opinion.

*C. E. Lane,* Assistant Attorney-General, for the State.

DAVIDSON, PRESIDING JUDGE.—Appellant was convicted of man-
slaughter. The jury acquitted appellant of murder in both degrees.
Therefore, it is not necessary to state with any degree of particularity
the State's evidence. In a general way the evidence shows that de-
ceased and appellant had been living in adulterous relations,—at least,
such is the inference from the facts. On the evening of the homicide
they had been in the town of Kerens, appellant having driven there in
a buggy. The deceased, Mary Lee Martin, became outraged with ap-
pellant for some reason, got in appellant's buggy and demanded that
he go home with her, which he at first declined. When she told him to
get in the buggy and appellant told her he did not want to, she said,
"You God damn scar-eyed son-of-a-bitch, if you don't go home with
me you will kill me or I will kill you." Appellant did not just at
that moment get in the buggy and deceased started to drive away in
the buggy; that he then got in the buggy to keep her from carrying off
his horse and buggy. Deceased was driving when she left the town of
Kerens. After going some distance from town they got into trouble.
The evidence is very confusing and much in conflict as to how this
arose and what occurred at the time. The State's theory was that
after they got out of the buggy appellant wanted her to get in and go
with him to get some clothing of his which he had left at her house.
She had changed her mind and said she would not go and was going
to return to Kerens. The State's evidence at this particular point is
that appellant told her she must go with him or he would kill her, or
words to that effect, and the difficulty began. Some of the witnesses
testified that while they were in the fight appellant struck the deceased
on the head with a buggy whip, which broke; he then got his knife and
cut her with it, inflicting one blow from which she subsequently died.
After striking her with the knife he helped her into the buggy and
drove away, carrying her to her own home, where she was subsequently
found dead. It is not intended to follow out the State's case on the
facts with any detailed statement, because of the acquittal of murder.
Appellant's testimony substantially was that he had known the de-
ceased three or four years; that he went to Kerens on the Saturday
afternoon of and preceding the killing in a buggy with his brother,
reaching that point about one o'clock, and hitched his horse to a cul-
tivator south of Mr. Foether's store; about half-past one or two o'clock
he saw deceased for the first time and saw her several times during
the afternoon. He testified that during the first conversation after he
reached Kerens, deceased asked him if he was going home with her;
that he informed her he was not, and no further reference was made
to the matter until late in the afternoon, when she again asked him if
he was going home with her; that he again told her he was not, and
she then informed him she was going to take his horse and buggy, and
he told her to leave it alone, that he did not want to go to her house.
Just before leaving town he was standing in company with Fred and
Gensie Colbert and Noland Tolliver; at this time deceased drove up

in his buggy and was right at him before he saw her; she told him to get in the buggy; he says, "I told her I didn't want to and she said, 'You God damn scar-eyed son-of-a-bitch, if you don't go home with me you will kill me or I will kill you.'" That he did not then get in the buggy and she started away; that he then got in the buggy to keep her from carrying away his horse and buggy. When they started out of the town, deceased was quarreling with him and cursing him for a son-of-a-bitch and one thing and another along the road; that she said to him, "I killed one negro and I will kill you." When they reached a point just below Mr. Floyd's she decided she would go back to town and he told her he had some clothes down at her house and wanted to go get them, and she said she was not going a God damn step; that she then hit him on the side of the head with her fist. "That hurt me. She then started into her stocking after her knife and I pushed her out of the buggy." That after he had pushed her out of the buggy he tried to get her to get back and go with him and get his clothes, but this she would not do. He says, "I pulled at her and she cut at me, and I cut at her and she cut my shirt. When I hit her with the buggy whip she was cutting at me with her knife. I did not have my knife out at that time; it was in my pocket. I have seen the knife which is now shown me before." (Counsel for defendant here showed the defendant the knife which defendant testified he picked up at the scene of the killing, thinking it was his knife.) Then appellant states, "That is her knife. That is the knife she had. I said I struck her with the whip because she was cutting at me with her knife. At that time I had not gotten my knife. I got it in a little while after that." That he was in his shirt sleeves and had his knife in his right-hand watch pocket of his pants. He gave a description of the cut on his shirt, showing that it was about the waistband of his pants and several inches long. That he had not worn that shirt any more until he wore it the day of the trial and showed it to the jury. He further testified: "I cut that woman with my knife because she was trying to kill me or cut me or something. When I cut at her I did not know where I hit her; I just knew I hit her up there somewhere. I was not aiming at any particular spot when I cut; I was just cutting anywhere I could. When I reached home that night there was nobody there but my mother and my wife. After I cut her she staggered back a little and I just caught hold of her arm and carried her to the buggy. When she fell I did not try to cut her throat or choke her. When I cut or stabbed her I did not intend to kill her. Just before I drove off I picked up a knife. It was her knife that I picked up. I intended to pick up my knife. I dropped my knife and she dropped her's and I picked up her knife." Without going into further detail of the testimony we think this is sufficient to discuss the main question involved.

1. The court failed and refused to charge on the law of aggravated assault, stating in his qualification to the bill of exceptions that he did not believe the facts suggested this issue. There is no description

of the knife, given by any of the witnesses, that is as specific or certain as that given by the defendant, above quoted. It is evident that the knife was a pocket-knife and could not have been a very large one if it was carried, as appellant says, in the watch pocket of his pants. The State's witnesses do not undertake to describe the knife. The wound proved to be a deadly one and is described as having been inflicted about three inches below the collarbone and a little to the left of the medium line of the breast. It was in a dangerous locality, as testified by the physician, and inflicted at a point where the probabilities were that it would strike an artery. There is practically no evidence in regard to the amount of loss of blood. Appellant requested an instruction submitting the issue of aggravated assault and giving in charge the provisions of Article 1147 of the Revised Penal Code. This Article reads as follows: "The instrument or means by which a homicide is committed are to be taken into consideration in judging of the intent of the party offending; if the instrument be one not likely to produce death, it is not to be presumed that death was designed, unless, from the manner in which it was used, such intention evidently appears." The weapon, not being one of a deadly character, it is not to be presumed that it was such a weapon, and if not being deadly in its nature the intent would not be presumed from that fact. Appellant himself testifies that he did not intend to kill her, but was cutting at her because she was cutting at him. It would be a useless consummation of time or words to review this question. It has been so often decided that we will content ourselves by simply citing the cases which made a charge of this sort necessary. Connell v. State, 45 Texas Crim. Rep., 142; Danforth v. State, 44 Texas Crim. Rep., 105; McDowell v. State, 55 Texas Crim. Rep., 596; Snowberger v. State, 58 Texas Crim. Rep., 530; Washington v. State, 53 Texas Crim. Rep., 480; Craiger v. State, 48 Texas Crim. Rep., 500; Crow v. State, 55 Texas Crim. Rep., 200; Shaw v. State, 34 Texas Crim. Rep., 435. The question involved has been so thoroughly discussed and reviewed in these cases, we dismiss that part of the case by saying that it was error on the part of the court to refuse to give these instructions and submit that issue to the jury.

2. There is another question in the case that appellant insists should reverse the judgment. Without conflict the evidence shows the deceased to have been a woman of dangerous, if not desperate character. She told appellant during their altercation that she had killed one negro and she purposed killing him. In this connection appellant offered to prove by the witness Fox that the deceased did kill another negro who was at the time of his being killed the husband of the deceased. This was offered for various purposes and thought by appellant to be germane and permissible under the peculiar facts of the case, as affecting her reputation as dangerous, as well as in connection with her statement to him that she had killed a negro. The court excluded this upon the theory that it was not proposed by defendant to

show that he was aware of the fact that she had killed her husband. The general rule is that testimony of isolated facts unknown to the accused that bear upon the reputation and character of deceased for violence would not be admissible. If he was aware of it, or had been informed of it, it would be admissible as tending to affect the mind and for such other legitimate purposes in the case. While we do not believe, under the peculiar facts of the case, it would be reversible error, yet, under what has been stated, we are of opinion that it should have gone to the jury for what it was worth in relation to the question of her threats and reputation in regard to being a dangerous woman. She had informed him of the fact that she had killed a negro, but had not specified what negro she had killed. While the fact that the deceased negro was her husband was not material, in view of the fact of his want of knowledge of said fact, but that she had killed another negro was known to him, the mere fact that it was her husband would not exclude the particular fact and it might have assisted the jury to determine the fact whether or not she was a woman of dangerous character and one who would execute her threats. If the statement had not been made to defendant by deceased that she killed one negro, then there would have been no error on the part of the court rejecting the testimony. If she stated to the defendant at the time of the difficulty that the negro she had killed was her husband, then it would have been admissible to show that she had killed her husband. The mere fact that she did not designate the particular negro she had killed, when she threatened the defendant, we believe would not, therefore, exclude the evidence that her husband was the negro she killed. Under all the circumstances this may not have amounted to a great deal, but still under the peculiar facts of the case we are of opinion that this evidence should have gone to the jury. This seems to be in line with the decision in the Childers case, 30 Texas Crim. App., 160, and quite a line of cases which follow and is in line with the Childress opinion. The deceased, in the Childress case, informed appellant of the fact that he killed a man, etc., not specifying who the man was, and stated that he had been in the penitentiary for killing a man. The court held that character of testimony was clearly admissible, and the court in this case seems to have followed the Childress case in admitting testimony that she had killed one negro at the time she threatened to kill him. If this matter comes up on another trial we see no reason why the name of the negro could not be produced in evidence.

3. There is some criticism of the charge on self-defense. Upon another trial we suggest to the trial court to give a clear charge on this subject unmixed with other matters in the case. The defendant is always entitled to a clear and affirmative presentation of his defensive matters whatever they may be.

The judgment is reversed and the cause is remanded.

*Reversed and remanded.*